# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KAREN N. CHANDLER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:04cv00086 |
| | ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:  PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I.  Background and Standard of Review

Plaintiff, Karen N. Chandler, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003).  Jurisdiction of this court is pursuant to 42 U.S.C. §  405(g).  This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more

-1-

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Chandler filed her initial application for DIB on or about November 3, 1998, alleging disability as of May 15, 1998. (Record, ("R."), at 22.) The claim was denied initially and not pursued further. (R. at 22.) Chandler then filed a second application for DIB on or about July 23, 1999, alleging disability as of May 15, 1998. (R. at 22.) The claim was denied initially, on reconsideration and following a hearing by an administrative law judge, ("ALJ"). (R. at 22.) The ALJ's decision was thereafter affirmed by the Appeals Council by order dated April 16, 2002. (R. at 22.) Chandler filed her current application for DIB on or about July 20, 2000, again alleging disability as of May 15, 1998,[1] based on back problems, pain in the legs, neck and knees, depression, a broken tailbone, migraine headaches, left ankle problems, pelvic problems, low energy, insomnia, hopelessness and concentration and memory problems. (R. at 97-99, 104.) The claim was denied initially and on reconsideration. (R. at 73-75, 76, 78-79.) Chandler then requested a hearing before an ALJ. (R. at 80.) On October 26, 2001, the Appeals Council vacated its reconsideration determination and remanded Chandler's claim to the state agency. (R. at 66-68.) Her claim was again denied. (R. at 83-84.) Chandler again requested a hearing before an ALJ. (R. at 85.) The ALJ held an initial hearing on July 2, 2002, and a supplemental hearing on October 24, 2002. (R. at 631-667.) Chandler was represented by counsel at both hearings. (R. at 631, 651.)

---

[1]Chandler later amended her alleged onset date to July 10, 2000. (R. at 633-34.)

-2-

By decision dated November 5, 2002, the ALJ denied Chandler's claim. (R. at 21-30.) The ALJ found that Chandler met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 29.) The ALJ found that Chandler had not engaged in substantial gainful activity since May 15, 1998, except for the period from December 15, 1999, through July 10, 2000, when her work activity was found to be at the level deemed to be substantial gainful activity.[2] (R. at 29.) The ALJ also found that the medical evidence established that Chandler suffered from severe impairments, namely mild degenerative changes in the dorsal and lumbar spine, a history of piriformis syndrome,[3] a history of right knee arthroscopy and partial meniscectomy with good results, headaches appropriately managed with medication and mild, nonsevere depressive disorder, but he found that Chandler did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) The ALJ further found that Chandler's subjective allegations were not credible. (R. at 29.) The ALJ found that Chandler had the residual functional capacity to perform simple, low-stress light work[4] that did not require prolonged standing and/or walking and that allowed for frequent postural changes. (R. at 29.) Thus, the ALJ found that Chandler could not

---

[2]Thus, for purposes of her current claim, Chandler must prove disability after July 10, 2000, her amended onset date.

[3]Piriformis syndrome is an irritation of the sciatic nerve caused by compression of the nerve within the buttock by the piriformis muscle. Typically, the pain of piriformis syndrome is increased by contraction of the piriformis muscle, prolonged sitting or direct pressure applied to the muscle. Piriformis syndrome is one of the causes of sciatica. Piriformis syndrome can cause difficulty walking due to pain in the buttock and lower extremity. *See* http://www.medterms.com/script/main/art.asap?articlekey=8210.

[4]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2004).

-3-

perform her past relevant work as a clerk/customer representative or as a cashier/supervisor. (R. at 29.) Based on Chandler's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national economy that Chandler could perform, including those of a small parts assembler, a hand packer, an inspector and a quality control person. (R. at 29-30.) Thus, the ALJ found that Chandler was not disabled under the Act and was not eligible for DIB benefits. (R. at 30.) *See* 20 C.F.R. § 404.1520(g) (2004).

After the ALJ issued his decision, Chandler pursued her administrative appeals, (R. at 15-17), but the Appeals Council denied her request for review. (R. at 8-12.) Chandler then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2004). The case is before this court on Chandler's motion for summary judgment filed March 1, 2005, and on the Commissioner's motion for summary judgment filed April 4, 2005.

## II. Facts

Chandler was born in 1973, (R. at 97), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Chandler has an high school education with two years of college credit and past work experience as an office clerk. (R. at 105, 110, 634-35.)

Chandler testified that she last worked in 2000 as an insurance billing clerk/customer service representative but had to quit because pain in her back and legs caused her to miss approximately 10 days per month. (R. at 635, 654-55.) She stated

that she worked prior to that as a credit card representative and as a cashier/supervisor at Office Max and at a retail clothing store. (R. at 655-56.) Chandler stated that her back pain radiated into her right leg and foot, and she noted that the back pain was "pretty much constant," while the leg pain would "come[] and go[]." (R. at 637, 658.) Chandler stated that she was undergoing epidural steroid injections, which eased her back pain for approximately two days. (R. at 640-41.) She stated that she also had muscle spasms in her legs. (R. at 645.) At her supplemental hearing, Chandler testified that her back and neck pain had worsened. (R. at 662.) She further testified that she had problems with her right knee and had undergone surgery in 1991 or 1992 and again in 2000. (R. at 637, 662.) She stated that her right knee still gave way at times, and she noted that her knee had worsened over the previous six months. (R. at 637-38, 662.)

Chandler testified that she could stand and/or walk for approximately 15 to 20 minutes and could sit for approximately 15 to 20 minutes. (R. at 638, 658.) She stated that sitting was difficult because she had previously fractured her tailbone by falling from a swing in 1998. (R. at 638, 658.) Chandler testified that sitting caused pain to shoot up into her lower back. (R. at 638, 658.) She stated that she had difficulty performing household chores, requiring her to hire someone to perform them for her. (R. at 642.) Chandler testified that she had difficulty bending, stooping, squatting, putting her shoes on, dressing herself and taking a shower, noting that her husband and stepdaughter helped her with these things. (R. at 643-44.) By the time of her supplemental hearing, Chandler testified that she used a cane to get around. (R. at 660.) She estimated that she could lift and carry a book. (R. at 660.)

Chandler further testified that she experienced migraine headaches once per week, requiring her to lie down. (R. at 639.) She stated that she took Stadol for her

headaches, which lasted almost 24 hours. (R. at 639.) By the time of her supplemental hearing, she stated that her headaches had increased to approximately two per week. (R. at 659.) She stated that she also experienced panic attacks, anxiety and depression, for which she was taking medication. (R. at 642.) Chandler testified to experiencing weekly crying spells, difficulty getting along with others and difficulty concentrating and remembering. (R. at 642-43.) She stated that she was involved in an automobile accident the previous year and suffered a closed head injury, resulting in memory problems. (R. at 643.) At her supplemental hearing, Chandler testified that her crying spells had increased and her depression and concentration problems had worsened. (R. at 660, 662.) Chandler testified that Dr. Williams had referred her for counseling, but she had not yet begun. (R. at 661-62.)

Chandler testified that she attended church and went out to eat weekly. (R. at 644.) However, she noted that she had to get up several times during the church service. (R. at 644.) She stated that she had to lie down approximately every three hours for one to two hours at a time. (R. at 645, 659.) Chandler stated that she had difficulty sleeping at night and noted difficulty lying on her back. (R. at 645-46.)

Norman Hankins, another vocational expert,[5] was present and testified at Chandler's supplemental hearing. (R. at 663-66.) Hankins classified Chandler's past work as a office clerk/customer service representative and telemarketer as light and semiskilled and her job as a cashier/supervisor as light and skilled. (R. at 663-64.) Hankins was asked to assume a hypothetical individual of Chandler's age, education and work history who could perform light work diminished by an inability to stand,

---

[5]Donna Bardsley, another vocational expert, testified at Chandler's initial hearing. (R. at 646-48.) Her testimony was substantially the same as Hankins's.

sit or walk for prolonged periods of time and, thereby, requiring a sit/stand option, and who could perform simple, low-stress work. (R. at 664.) Hankins testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a small parts assembler, an electronic assembler, a hand packer, an inspector and a quality control person. (R. at 665.) Hankins was next asked to consider the same individual, but who could perform sedentary work. (R. at 665.) Hankins testified that such an individual could perform the jobs of an assembler, an inspector and a hand packer. (R. at 665.) Hankins was next asked to assume the individual from the first hypothetical, but who was restricted as set forth in Dr. Williams's July 1, 2002, assessments. (R. at 537-42, 665-66.) He stated that such an individual could perform no jobs. (R. at 666.) Finally, Hankins was asked to consider the same individual, but who also was restricted as set forth in Spangler's May 29, 2002, assessment. (R. at 458-66, 666.) Hankins testified that such an individual could perform no jobs. (R. at 666.)

In rendering his decision, the ALJ reviewed records from Dr. Luciano D'Amato, M.D.; Norton Community Hospital; Wellmont Lonesome Pine Hospital; Dr. Syed Zafar Ahsan, M.D.; Hawkins County Memorial Hospital; Dr. Richard C. Norton, M.D.; Holston Valley Medical Center; Dr. Gary S. Williams, M.D.; Wellmont Holston Valley Hospital; Dr. Marc A. Aiken, M.D.; Johnson City Medical Center; Dr. Fernando Lagrimas, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Randall Hays, M.D., a state agency physician; Lee County Community Hospital; Dr. Michael J. Hartman, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Dr. D.M. Aguirre, M.D.; Dr. Mohammed A. Bhatti, M.D.; Dr. Jerry Kotulla, M.D.; Wellmont Physical Therapy; C. Marcus Cooper, Ph.D., a pain specialist; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Frank M. Johnson,

-7-

M.D., a state agency physician; Dr. W. Turney Williams, M.D.; Lee Regional Medical Center; Robert S. Spangler, Ed.D., a licensed psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna Abbott, M.A., a licensed psychological examiner; and Johnston Memorial Hospital. Chandler's counsel also submitted additional medical records from Hawkins County Memorial Hospital; Norton Community Hospital; Lonesome Pine Hospital; Medex Regional Laboratories; Dr. Gary S. Williams, M.D.; Dr. Steven R. Prince, M.D.; and Bristol Medical Associates to the Appeals Council.[6]

## II. Facts and Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

_____

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 8-12), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 5, 2002, the ALJ denied Chandler's claim. (R. at 21-30.) The ALJ found that Chandler met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 29.) The ALJ found that Chandler had not engaged in substantial gainful activity since May 15, 1998, except for the period from December 15, 1999, through July 10, 2000. (R. at 29.) The ALJ also found that the medical evidence established that Chandler suffered from severe impairments, but he found that Chandler did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) The ALJ found that Chandler had the residual functional capacity to perform simple, low-stress light work that did not require prolonged standing and/or walking and that allowed for frequent postural changes. (R. at 29.) Thus, the ALJ found that Chandler could not perform her past relevant work as a clerk/customer representative or as a cashier/supervisor. (R. at 29.) Based on Chandler's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national economy that Chandler could perform. (R. at 29-30.) Thus, the ALJ found that Chandler was not disabled under the Act and was not eligible for DIB benefits. (R. at 30.) *See* 20 C.F.R. § 404.1520(g) (2004).

-9-

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Chandler argues that the ALJ erred by failing to adhere to the treating physician's rule and give controlling weight to the opinions of Dr. Williams. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 12-21.) Chandler next argues that the ALJ erred by failing to find that she met or equaled the listing for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. (Plaintiff's Brief at 21-26.) Finally, Chandler argues that the ALJ erred by failing to properly address the effect of her pain on her ability to perform substantial gainful activity. (Plaintiff's Brief at 26-33.)

Chandler first argues that the ALJ erred by rejecting the opinions of Dr. Gary S. Williams, M.D., her treating physician. I disagree. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the

opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2004). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In his opinion, the ALJ stated that he was rejecting Dr. Williams's opinion that Chandler could not perform the jobs indicated by the vocational expert because his own clinical findings and reports are inconsistent with such an opinion. (R. at 28.) The ALJ further found Dr. Williams's opinion inconsistent with the findings of numerous other medical sources. (R. at 28.) I agree. I will first address Chandler's physical impairments and then her mental impairments.

In a physical assessment of July 1, 2002, Dr. Williams opined that Chandler could lift and/or carry items weighing up to only five pounds occasionally and up to two and one-half pounds frequently. (R. at 537-39.) He further found that she could stand and/or walk for a total of two to three hours, but for only 15 to 20 minutes without interruption. (R. at 537.) Dr. Williams found that Chandler could sit for a total of two to three hours, but for only 10 to 15 minutes without interruption. (R. at 538.) He further found that she could never climb, stoop, kneel, balance, crouch or crawl and he found that her abilities to reach and to push and/or pull were affected by her impairments. (R. at 538.) Dr. Williams concluded that Chandler should avoid

heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 539.) Dr. Williams also completed a mental assessment finding that Chandler had a fair ability in seven areas of adjustment and a poor or no ability in the remainder of areas of adjustment. (R. at 540-41.)

Despite the imposition of such harsh restrictions, the record reveals that Dr. Williams had placed no restrictions on Chandler before that time. Moreover, physical examinations generally revealed only mild findings, including patellar, lumbar and gluteal tenderness, as well as migraine headaches. (R. at 231, 235, 237, 240-43, 249, 254, 559, 619). Although Chandler did undergo arthroscopic surgery on her right knee, the record reveals that it was resolving nicely. (R. at 272.) With regard to her back and gluteal pain and headaches, she was treated conservatively with pain medications, epidural steroid injections, physical therapy and water aerobics. Dr. Williams himself even noted in February 2001 inconsistencies on physical examination suggestive of symptom magnification. (R. at 241.) Moreover, the following month, Dr. Williams noted that his staff had informed him that when Chandler walked into the waiting room, she did not limp. (R. at 240.) However, when she proceeded into the clinical area, she exhibited a limp. (R. at 240.) Likewise, in July 2001, Dr. Williams noted that Chandler's pain perception appeared to be out of proportion with the objective testing. (R. at 235.) Furthermore, on July 11, 2001, Chandler reported to Dr. Williams that she was unable to keep an appointment because her husband was undergoing neck surgery. (R. at 234.) However, when Dr. Williams called to confirm this, he was informed that no such surgery was scheduled. (R. at 234.) Physical examinations showed a good range of motion of the neck and no spinal tenderness. (R. at 234.) In November 2001, Dr.

Williams noted that Chandler appeared to be in no severe distress. (R. at 231.) In January 2002, Dr. Williams again noted that Chandler's physical examination was "a little inconsistent," and he further noted that his office had received an anonymous telephone call stating that Chandler was taking other medications. (R. at 230.) By March 2002, Dr. Williams noted that Chandler "looked the best [he had] seen her since [he had] been following her," and in July 2002, Dr. Williams advised Chandler to increase activities as tolerated. (R. at 229, 560.)

In addition to being inconsistent with his own clinical notes, Dr. Williams's findings are inconsistent with the other medical sources of record, including the state agency physicians. For instance, in September 2000, Dr. Randall Hays, M.D., concluded that Chandler could perform light work and he imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 292-99.) Dr. Michael J. Hartman, M.D., made the same findings in December 2000. (R. at 308-16.) Likewise, Dr. Frank M. Johnson, M.D., concluded the same in December 2001. (R. at 396-405.) In addition to the state agency physicians, the other medical sources noted only minimal findings. For instance, in November 1998, an MRI of the lumbar spine revealed disc dessication and degenerative changes at the L4-L5 and L5-S1 levels of the spine. (R. at 183.) However, no evidence of disc herniation was noted. (R. at 183.) A physical examination on January 7, 1999, revealed only mild tenderness of the lumbosacral area. (R. at 178.) On June 1, 2000, Chandler reported improvement of the right knee. (R. at 253.) On June 16, 2000, she was able to heel and toe walk, as well as stand and squat, stand and bend and touch her knees and stand. (R. at 257.) Straight leg raising was negative bilaterally and the lumbar spine was nontender. (R. at 257.) Later that month, Chandler exhibited positive straight leg

-13-

raising on the right and much tenderness over the right piriformis area and right sacroiliac joint, but she had normal gait. (R. at 252.) On June 30, 2000, x-rays of the lumbar spine showed mild scoliosis, but no compression, and very minimal disc space narrowing at the L4-L5 and L5-S1 levels. (R. at 264.) A CT scan of the cervical spine showed no significant abnormalities. (R. at 265-67.) In July 2000, Chandler was diagnosed with a lateral meniscus tear, for which she underwent arthroscopic surgery on August 1, 2000. (R. at 274-75, 277-78.) By August 16, 2000, a physical examination revealed only trace effusion which was resolving nicely. (R. at 272.) She was encouraged to move aggressively with physical therapy. (R. at 272.) On July 19, 2000, a physical examination revealed paravertebral spasm over the lumbosacral area, but no localized tenderness. (R. at 250.)

In October 2000, Dr. David Nauss, M.D., a pain specialist, noted tenderness of the midline L3 to the sacral region. (R. at 307.) Chandler's motor functioning was intact in both lower extremities, sensation was decreased in the right lower extremity and straight leg raising was positive at 80 degrees on the left. (R. at 307.) She also exhibited extreme tenderness in the right buttock area. (R. at 307.) Later that month, Chandler exhibited positive straight leg raising on the right, but could perform good dorsi and plantar flexion of the feet. (R. at 247.) In February 2001, Dr. D.M. Aguirre, M.D., another pain specialist, noted that Chandler was exquisitely tender over the gluteus muscles, and she exhibited tenderness over the tailbone. (R. at 334.) Straight leg raising was negative. (R. at 334.) In March 2001, Chandler noted that medication helped her headaches. (R. at 337.) In April 2001, Dr. Jerry Kotulla, M.D., noted that Chandler had difficulty sitting for long periods of time, walking and with range of motion at the waist. (R. at 344.) She exhibited decreased sensation in the right leg

-14-

down to the ankle, but had normal strength and hyporeflexive response in the upper and lower extremities. (R. at 344.) Chandler exhibited positive straight leg raising bilaterally and severe pain on palpation at the L5 level. (R. at 344-45.) She further exhibited sensitivity around the right greater trochanter and right piriformis muscle, as well as the coccygeal and sacral areas. (R. at 345.)

Also in April 2001, Chandler exhibited a decreased range of motion in the lumbar spine, but range of motion of the ankles, knees and hips were within normal limits. (R. at 350.) She reported increased pain with palpation of the sacrum area and the lumbar paraspinals. (R. at 350.) However, straight leg raising, sacral gapping and compression were negative. (R. at 350.) Becky Greene, a physical therapist, advised Chandler to avoid bending, sitting for more than 20 minutes, walking up hills and sleeping on her right side. (R. at 350, 352.) On April 23, 2001, C. Marcus Cooper, Ph.D., a pain specialist, noted trigger points throughout the upper and lower body bilaterally. (R. at 360.) However, he further noted that Chandler had a "fairly significant exaggerated pain response to palpation." (R. at 360.) In June 2001, after falling out of a chair and hitting her head and back on concrete, a CT scan of the head was negative and x-rays of the back and neck were normal. (R. at 367-68.)

In January 2002, Chandler's back was extremely tender in the right flank and right sacroiliac joint. (R. at 409.) On February 14, 2002, Dr. W. Turney Williams, M.D., ("Dr. T. Williams"), noted that Chandler had intact sensation, motion function and reflexes. (R. at 406-08.) She exhibited tenderness bilaterally over the lumbar paravertebral musculature and mildly in the gluteus muscle. (R. at 407.) In March 2002, x-rays of the lumbar spine showed mild scoliosis and slight disc space

-15-

narrowing at the lumbosacral junction, but no acute compression. (R. at 434.) X-rays of the cervical spine showed some degree of straightening of the curvature, but no acute bony injury. (R. at 435.) Later that month, Dr. Mohammed A. Bhatti, M.D., noted that Chandler's strength was normal in both legs and deep tendon reflexes were hypoactive over both knees. (R. at 421.) She exhibited point tenderness over the L3-L4 paraspinal muscles and the midline. (R. at 421.) In July 2002, Chandler noted improvement of her headaches. (R. at 560.) She exhibited tenderness and spasm of the posterior back musculature and the upper back musculature of a significant degree. (R. at 560.) Chandler had a little difficulty heel and toe walking bilaterally, and straight leg raising was equivocal bilaterally. (R. at 560.) On September 19, 2002, x-rays of the cervical spine showed some disc space narrowing at the C4-C5 level. (R. at 554.) X-rays of the lumbar spine taken on July 23, 2002, revealed broad based disc protrusions at the L4-L5 and L5-S1 levels and reactive marrow edema at the L5-S1 level due to end plate degeneration. (R. at 556.)

On January 22, 2004, an MRI of the lumbar spine showed degenerative disc disease at the L4-L5 and L5-S1 levels with no evidence of disc extrusion or obvious nerve root compromise. (R. at 630.) Age-related facet disease was noted bilaterally. (R. at 630.)

Thus, given the inconsistencies between Dr. Williams's physical assessment and his own treatment notes, as well as the findings and opinions of other medical sources contained in the record, I find that substantial evidence supports the ALJ's rejection of Dr. Williams's opinions.

Regarding Chandler's alleged mental impairments, in September 2000, a physician's assistant for Dr. Williams noted that Chandler was "obviously very depressed." (R. at 248.) Chandler was diagnosed with depression and was continued on Klonopin. (R. at 248.) The following month, Chandler reported continued depression. (R. at 247.) She was again diagnosed with depression. (R. at 247.) In November 2000, Chandler reported several social stressors, but was reluctant to consider antidepressants. (R. at 245.) In December 2000, Dr. Williams again diagnosed depression. (R. at 244.) By January 2001, Dr. Williams noted that Chandler was more emotionally stable. (R. at 242.) In August 2001, Dr. Williams opined that a lot of Chandler's difficulties involved a psychiatric overlay. (R. at 233.) She was again diagnosed with depression. (R. at 233.) In May 2002, Dr. Williams again diagnosed Chandler with depression. (R. at 423.) In July 2002, Dr. Williams completed a mental assessment, concluding that Chandler had a fair ability to follow work rules, to relate to co-workers, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions, to maintain personal appearance and to behave in an emotionally stable manner. (R. at 540-41.) In all other areas of adjustment, Dr. Williams found that Chandler had a poor or no ability. (R. at 540-41.) Nonetheless, he found that Chandler could manage benefits in her own best interest. (R. at 542.)

I first note that Dr. Williams's mental assessment is inconsistent with the remainder of his treatment notes. He had previously diagnosed Chandler with depression and placed her on medications, however, he placed no restrictions on her activities up to the time of his mental assessment. I further note that Dr. Williams's mental assessment is inconsistent with the other medical evidence of record. For

-17-

instance, in October 1998, Dr. Catherine Page, M.D., at Appalachian Neurological and Psychiatric Services, noted that Chandler was fully oriented, her speech was coherent and relevant and her thought processes were normal. (R. at 197.) She displayed a normal mood and a congruent affect. (R. at 197.) Importantly, Chandler noted that she had no goals in life but to obtain social security. (R. at 197.) Dr. Page stated that she could not rule out secondary gains influencing Chandler's report of symptoms. (R. at 197.) Chandler was diagnosed with depression, episodic, mild, and a Global Assessment of Functioning, ("GAF"), score of 60 with a past score of 80.[7] (R. at 197.)

The following month, Chandler saw Dr. Syed Zafar Ahsan, M.D., at Appalachian Neurological and Psychiatric Services. (R. at 194-95.) She reported that Prozac helped her initially. (R. at 194.) Dr. Ahsan noted that Chandler's cognitive function and memory were grossly intact and that she had good judgment and insight. (R. at 195.) He diagnosed her with major depression of a mild severity. Chandler was given a trial of Remeron, her dosage of Prozac was increased and she was continued on Klonopin. (R. at 195.) On June 28, 1999, Dr. Ahsan noted that Chandler had missed six follow-up appointments. (R. at 192.) She noted continued depression. (R. at 192.) Her cognitive functioning was grossly intact, no formal thought disorder was identified and her judgment and insight were described as fair. (R. at 192.) Dr.

---

[7]The GAF scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32. A GAF of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors ... no more than slight impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

Ahsan diagnosed Chandler with dysthymia and generalized anxiety disorder, and she was given a trial of Wellbutrin. (R. at 192-93.) By August 1999, Dr. Ahsan again noted that Chandler had missed her two previous sessions. (R. at 190.) Nonetheless, Chandler reported feeling "somewhat better than before." (R. at 190.) Her mood and affect were described as euthymic and judgment and insight as good. (R. at 190.) She was continued on Wellbutrin and her dosage of Klonopin was increased. (R. at 190.) On September 14, 1999, Chandler was fully oriented, her speech was logical, coherent and relevant and her thought processes were normal. (R. at 189.) She displayed a depressed mood with a tearful affect. (R. at 189.) Dr. Ahsan diagnosed depression, episodic, moderate. (R. at 189.)

On September 7, 2000, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Chandler suffered from a nonsevere affective disorder. (R. at 282-91.) Jennings found that Chandler experienced only slight restrictions on her activities of daily living, experienced slight difficulties in maintaining social functioning, seldom experienced deficiencies of concentration, persistence or pace and never experienced episodes of deterioration or decompensation. (R. at 290.)

On January 5, 2001, Hugh Tenison, Ph.D., another state agency psychologist, completed a PRTF, concluding that Chandler suffered from a nonsevere affective disorder. (R. at 317-31.) Tenison found that Chandler was only mildly restricted in her activities of daily living, experienced no difficulties in maintaining social functioning, experienced only mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 327.)

-19-

Tenison noted that the medical evidence revealed many inconsistencies in Chandler's complaints and reports to various treating sources. (R. at 331.) Moreover, Tenison noted that Chandler's psychiatric impairment had responded to appropriate treatment despite inconsistent attendance to treatment sessions. (R. at 331.) He concluded that her ability to function did not appear to be significantly affected by mental impairments and he, thus, found her allegations to be only partially credible. (R. at 331.)

On December 13, 2001, R.J. Milan Jr., Ph.D., yet another state agency psychologist, completed a PRTF, indicating that Chandler suffered from a nonsevere affective disorder and a nonsevere anxiety related disorder. (R. at 380-95.) Milan concluded that Chandler was not restricted in her activities of daily living, had no difficulties in maintaining social functioning, experienced only mild difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 390.) Milan concluded that the medical evidence of record did not document a severe mental impairment and that Chandler's mental allegations were only partially credible, noting that the record suggested symptom magnification and manipulation by Chandler for the purpose of disability seeking. (R. at 392.)

In January 2002, Chandler reported that medication had helped her depression. (R. at 422.) On May 29, 2002, Chandler saw Robert S. Spangler, Ed.D., a licensed psychologist, for a psychological evaluation. (R. at 458-64.) Spangler noted that Chandler seemed socially confident, but depressed and anxious. (R. at 458.) He further noted that she generally understood directions, but demonstrated erratic concentration secondary to anxiety and depression. (R. at 458.) Spangler reported

-20-

that she was appropriately persistent on tasks. (R. at 458.) He further noted that Chandler was alert and fully oriented, had adequate recall of remote and recent events, was depressed and mildly anxious, exhibited concrete thinking and poor insight. (R. at 460.) Spangler opined that Chandler had borderline to low average intelligence and emotional lability. (R. at 460.) He noted no indications of malingering. (R. at 460.) Spangler rated Chandler's social skills as adequate, and he noted that she had the judgment necessary to handle her own financial affairs. (R. at 460-61.)

Spangler administered the Wechsler Adult Intelligence Scale-Third Revision, ("WAIS-III"), test, on which Chandler obtained a verbal IQ score of 81, a performance IQ score of 84 and a full-scale IQ score of 80, placing her in the low average range of intelligence. (R. at 461, 463.) Spangler also administered the Wide Range Achievement Test-3, ("WRAT-3"), the results of which were consistent with the WAIS-III. (R. at 461, 463-64.) Spangler opined that the test results were a reliable and valid estimate of Chandler's abilities at that time. (R. at 461.) He diagnosed her with depressive disorder, not otherwise specified, moderate, panic disorder without agoraphobia, mild to moderate, and low average intelligence. (R. at 461.)

Spangler also completed a mental assessment, finding that Chandler had a good ability to understand, remember and carry out simple job instructions, between a good a fair ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to maintain attention and concentration, to function independently and to maintain personal appearance, a fair ability to deal with the public, to deal with work stresses, to behave in an emotionally stable manner, and to relate predictably in

social situations, a poor ability to understand, remember and carry out detailed job instructions and to demonstrate reliability and no ability to understand, remember and carry out complex job instructions. (R. at 465-66.)

On August 1, 2002, Chandler saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., a licensed psychological examiner, for a psychological evaluation. (R. at 543-48.) She reported that she was not involved in any psychiatric treatment at that time. (R. at 544.) Lanthorn and Abbott noted that Chandler was fully oriented, but only marginally cooperative. (R. at 545.) She was able to attend, concentrate, follow directions and complete tasks. (R. at 545.) Lanthorn and Abbott opined that Chandler was of low average intelligence, but again noted that she did not put forth her best effort. (R. at 545.) They noted no overt signs of disordered thought processes or delusional thinking. (R. at 545.) Chandler was rational and alert. (R. at 545.) Lanthorn and Abbott diagnosed Chandler with dysthymic disorder, rule out generalized anxiety disorder, and a GAF score of 65.[8] (R. at 547.) They noted that Chandler appeared to attempt to present herself in a negative light at times. (R. at 547.)

Abbott also completed a mental assessment, finding that Chandler had an unlimited ability to understand, remember and carry out simple job instructions, a good ability to maintain personal appearance and a fair ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with

_____

[8]A GAF of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 549-50.) Abbott concluded that Chandler had a poor or no ability in only three areas of adjustment, namely dealing with work stresses, understanding, remembering and carrying out complex job instructions and demonstrating reliability. (R. at 550.) Abbott concluded that Chandler retained the ability to manage benefits in her own best interest. (R. at 551.)

Because Dr. Williams's opinion regarding Chandler's mental impairments is inconsistent with his own treatment notes and the findings and opinions of other medical sources contained in the record, I find that substantial evidence supports the ALJ's decision to reject such opinion.

Chandler next argues that the ALJ erred by failing to find that she met or equaled the listing for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. For the reasons that follow, I disagree.

Section 1.04 requires that the disorder result in *compromise of the nerve root or the spinal cord* with either (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or motor loss and, if there is involvement of the lower back, positive straight leg raising test; or (2) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for

-23-

changes in position or posture more than once every two hours; or (3) lumbar spinal stenosis resulting in psuedoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00(B)(2)(b).

The Commissioner correctly notes in her brief that in order for a claimant to demonstrate that her impairments meet or equal a listed impairment, she must prove that she "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, Chandler does not meet or equal § 1.04 because the record reveals no evidence of nerve root compression. On June 30, 2000, x-rays of the lumbar spine showed mild scoliosis, *but no compression*, and very minimal disc space narrowing at the L4-L5 and L5-S1 levels. (R. at 264.) On April 12, 2001, straight leg raising, sacral gapping and *compression were negative.* (R. at 350.) On March 21, 2002, x-rays of the lumbar spine showed mild scoliosis and slight disc space narrowing at the lumbosacral junction, but *no acute compression*. (R. at 434.) As recently at January 22, 2004, an MRI of the lumbar spine showed only degenerative disc disease at the L4-L5 and L5-S1 levels with no evidence of disc extrusion or *obvious nerve root compromise*. (R. at 630.)

Because there is no objective medical evidence of record showing that Chandler suffers nerve root or spinal cord compromise, she does not meet or equal § 1.04. Thus, substantial evidence supports the ALJ's failure to find that Chandler's impairments meet or equal § 1.04.

-24-

Chandler lastly argues that the ALJ erred by failing to properly consider the effect of her pain on her ability to perform substantial gainful activity. Again, I disagree. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers. ...

*Craig*, 76 F.3d at 595.

In his decision, the ALJ noted that he had considered all of Chandler's allegations of disabling pain and other symptoms. (R. at 26.) However, he further noted that the record did not demonstrate that Chandler had a medically determinable

-25-

impairment or combination of impairments that would be expected to result in severe or disabling pain. (R. at 26.) The evidence of record supports this finding. Chandler has undergone extensive diagnostic testing, all of which reveal findings not deemed significant. For instance, x-rays, CT scans and MRIs of the lumbar s pine have shown only degenerative disc disease, and mild scoliosis, but as previously discussed, no nerve root compression. (R. at 183, 264, 434, 556, 630). Moreover, as the ALJ noted in his decision, although Chandler has undergone arthroscopic surgery of the right knee, her condition has "resolv[ed] nicely." (R. at 272.) Furthermore, Chandler's headaches appear to be controlled with medication. Finally, I note that there have been serious concerns voiced by several treating sources regarding Chandler's credibility, as outlined previously.

For all of these reasons, I find that substantial evidence supports the ALJ's finding that Chandler does not suffer from disabling pain.

I further find that substantial evidence supports the ALJ's finding as to Chandler's residual functional capacity and as to the availability of other jobs she could perform.

## III.  Conclusion

For the foregoing reasons, Chandler's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision to deny benefits is affirmed.

An appropriate order will be entered.

DATED:     This 22nd day of July, 2005.


                              /s/   *Pamela Meade Sargent*
                              UNITED STATES MAGISTRATE JUDGE